HARROUN et al. v. BRUSH ELECTRIC LIGHT CO.

(Supreme Court, Appellate Division, Fourth Department. December 15, 1896.)

1. INJURY TO SERVANT—ELECTRIC LIGHT WIRES.

Whether the death of an employé of an electric light company, caused by a current passing through a lamp which he was trimming, was due to negligence of the company in the care of its lines and lamps, is a question for

the jury, where there is evidence that the insulation on the wires was partially worn off, that the wires were crossed, and that the lamp was not properly insulated.

**2. NEGLIGENCE—CONDITION OF ELECTRIC WIRES AFTER ACCIDENT.**
    Testimony that the insulation of electric wires was worn away three days after an accident caused by them is admissible, it being proved that the wires were then in the same condition as at the time of the accident.

**8. SAME—PREVIOUS SAFETY OF WIRES.**
    Evidence that no accident has happened before on electric wires which, by being crossed, caused a death, is inadmissible, without showing that the same conditions existed before.

**4. MASTER AND SERVANT—CARE OF APPLIANCES.**
    The diligence required of an employer in the care of his appliances increases with the danger connected with the forces used.

**5. SAME—RELIANCE ON MASTER'S CARE.**
    An employé of an electric light company, who is sent to trim lamps at a time when the wire connected with such lamps is usually "dead," and who knows that lamps are never trimmed while on "live" wires, has a right to assume that the wire will not become alive through the negligence of the company.

Appeal from trial term, Monroe county.

Action by Medora A. Harroun and Albert O. Fenn, as administrators of Fred J. Harroun, against the Brush Electric Light Company, for causing the death of the said Fred J. Harroun. From a judgment entered on a verdict for plaintiff, and from an order denying a motion for new trial on the minutes, defendant appeals. Affirmed.

Argued before HARDIN, P. J., and FOLLETT, GREEN, and WARD, JJ.

Joseph W. Taylor, for appellant.

Charles Roe, for respondents.

FOLLETT, J.   This action was begun January 7, 1895, to recover damages occasioned by the death of the plaintiffs' intestate, caused, it is alleged, by the negligence of the defendant.

In 1894, the defendant was engaged in lighting, by electricity, the streets, dwellings, and places of business in the city of Rochester, and in supplying electrical power.   For two years before his death, which occurred September 11, 1894, Fred J. Harroun, plaintiffs' intestate, had been employed as a lamp trimmer.   About 15 minutes after 7 o'clock in the morning of Tuesday, September 11, 1894, while engaged in trimming a Brush street lamp at Wolff Park, he was killed by an electric shock.   No person saw the accident.   This lamp, when burning, was held in position by a wire cable, called a "tail guy," extending from the lamp to the pole, to which it was secured by a padlock.   To trim the lamp, it was usual to unlock the tail guy, and lower the lamp part way to the ground, so that it could be reached when the trimmer was standing on a short ladder. This lamp was on circuit or wire No. 12 for lighting the streets. On the same arm and pole was a wire, known as "circuit No. 18," for the transmission of power, and which is called "power wire." These wires were from 12 to 18 inches apart.   The evening before the accident a current of electricity was turned onto No. 12 at 7:55

o'clock, and on the morning of the accident it was turned off at 5:05 o'clock, and on this morning the current was turned onto No. 18 at 7 o'clock, and the custom was to turn it off at midnight. Between 5:05 o'clock a. m. and 7:55 o'clock p. m. No. 12 was, in electrical parlance, "dead," and No. 18, between 7 a. m. and midnight, was "alive." The plaintiffs' intestate was found, lying on the ground, grasping the iron frame of the lamp with his left hand, which was burned to the bone by the current which caused his death.

Whether the intestate took hold of the frame of the lamp with his left hand, for the purpose of trimming it, received the shock, and fell, carrying down the lamp, and breaking the tail guy, or whether the tail guy broke when he attempted to lower the lamp, and he seized the lamp to prevent it from falling, and so received the shock, and fell to the ground with the lamp, is not known. The evidence establishes, beyond doubt, that wires Nos. 12 and 18 were crossed a short distance from the scene of the accident, and No. 18 was in contact with the tin cornice of a building on State street, where the insulation of No. 18 was worn off, and so a "ground" was formed.

It is conceded that the current which killed the intestate was communicated through the iron frame of the lamp. It was established that, if this frame had been, at the time, properly insulated, the current could not have been communicated to and through it to the intestate. The plaintiffs insisted that the lamp frame was defectively insulated. The defendant insisted that the frame was properly insulated, but that a sparrow had built a nest on the lamp frame near the wire communicating with the lamp, which was saturated with moisture, and formed a conductor between the wire and the frame of the lamp, and that it was the duty of the intestate to keep the lamps free from bird's nests, and that by his failure to do this he contributed by his negligence to the accident. This issue was sharply contested before the jury, and evidence given which would support a finding for or against the defendant. It was also shown, beyond dispute, that the defendant's wires were carried through trees, with the limbs of which the wires were sometimes in contact, and that the swaying of the limbs crossed the wires on many occasions. It was also shown that the insulation on the wires, where they passed through trees, was worn off, so that, when a dead wire was in contact with a live wire, and there was a ground, the electrical current was communicated to the dead one. It was also shown that wire No. 12 had been in use for 10 years, and wire No. 18 for 5 or 6 years, and that weather-proof insulation on such wires ceases to insulate effectually after 8 or 10 years. It was also shown that the wires were crossed at this place between 3 and 4 o'clock in the evening of the day before, and while in contact they emitted light, and that the heat burned away the insulation. There was considerable evidence that, at different points on wires Nos. 12 and 18, the insulation had from one cause and another worn off, so that the wires were not effectually insulated.

An electrical engineer, Mr. Putman, who examined this lamp on the 14th of September, 1894, the third day after the accident, testi-

fied that the carbons were in contact with the shade holder, which was not insulated from the frame of the lamp, and that there was nothing to prevent a current of electricity from passing from the carbons through the shade holder and into the frame of the lamp. He testified in the most positive terms that the lamp was imperfectly constructed, the defect being the ability to cross the shade holder with the carbons. He testified:

"With the insulation of the lamp as I found it, under some conditions, I should say, the current would be communicated into the frame with sufficient force to kill a man who took hold of it. If the man did not take hold of the frame at all, the current would surely go right on through the wire. If he took hold of the frame, and formed a ground by standing on the ground, under certain conditions he might form a short circuit, and the current could go through him. If the insulation of the lamp was proper, the current of electricity could not get away from the wire and into the frame."

Defendant's foreman testified:

"If it [the lamp] was properly insulated, the frame would be harmless to handle."

The theory of the defendant (that the electrical current was communicated to the lamp frame through the bird's nest) being discarded by the jury, the theory of the plaintiffs (that the lamp was defectively insulated) is justified by the evidence.

Other evidence was given tending to show that the insulation of these wires had been worn away in various places, and that the wires were so run through trees that they were frequently crossed. Other evidence was given tending to show that this lamp was defectively insulated, but enough has been quoted to show that a question of fact was presented, for the jury to determine, whether the defendant was negligent in the care of its line and lamps, and the verdict of the jury should be sustained. There was no evidence that the negligence of the intestate contributed to the accident. The negligence alleged is that he did not wear rubber gloves when trimming the lamp, and did not clear away the bird's nest. All the evidence is to the effect that gloves are not worn when trimming lamps on dead wires, but are used in the nighttime on live wires. The defendant's witnesses testified to this, and also to the further fact that it would be impossible for a trimmer to do the amount of work required of him if he used gloves.

It is urged that the court erred in permitting a witness to testify to the condition in which he found the wires three days subsequently to the accident. It was proved that the wires were then in the same condition that they were at the time of the accident, and before, and the evidence of the witness was simply to the effect that the insulation was worn away in many places, which was not controverted by the defendant.

At folio 311 the defendant asked its foreman:

"Did you have any trouble, which resulted in an accident, on circuit 12 or 18, before the accident to Harroun?"

This was objected to as immaterial, the objection was sustained, and an exception taken, and the ruling is urged as an error. Subsequently the same witness was permitted to testify:

"Before this accident, no report was made to me of any trouble in the insulation of the wires on Jay street, on circuits 18 or 12. If there was trouble, I am the person to whom it would be reported."

Besides, it was not competent for the defendant to prove that no accident had happened before on these wires, without showing that the same conditions existed.

Two exceptions taken to the charge of the court are argued. The court charged:

"Then, in cases like this, where the action is between employer and employé, two other rules apply, which have no place in a case between a corporation and an outsider not connected with it. The first of those two rules is that it is the duty of the employer to furnish safe machinery, tools, appliances, and a safe place in and with which the employé may work. In this case, so far as that question applies, we have to deal wholly with appliances. The question of place does not enter into our consideration. All of this work which the deceased was required to do was done out of doors, and the question, so far as the duty of the employer is concerned, related wholly to the question of appliances. The law requires, not that degree of diligence and foresight which is required of an insurer, or which the law might require of a corporation towards the public, but simply reasonable care and prudence in the selection of safe and suitable appliances for the use of employés. You will readily apprehend that this term, 'reasonable care and prudence,' is, however, a relative one, to be determined by the nature of the thing which is required of the employé. So that what would be sufficient care and foresight in one case would, perhaps, be utterly inadequate in another; and I think it may fairly be said that while, in a general way, the law requires simply reasonable care and foresight by the employer in the selection and provision of appliances for the use of the employé, *that care and prudence must be proportioned to what may properly be expected of him under the circumstances, and increases in a corresponding ratio with the danger and hazard necessarily connected with the use of the appliances.*"

The italicized portion of this instruction was excepted to. It seems to me that there was no error in the instruction given. It is well settled that the degree of care required is measured by the danger of the forces employed.

The court instructed the jury that the intestate had a right to assume that wire No. 12 was dead, and that no act of omission or commission on the part of the defendant would contribute to make it a live one. All the evidence is to the effect that, at this time in the morning, when the lamps were being trimmed, wire No. 12 was supposed to be dead, and that trimmers were not set at work trimming lamps on live wires; and the intestate had the right to assume that the wire was dead, and that it would not be made alive and dangerous by any negligent act of the defendant. The only possible criticism that can be made upon this instruction is that the court did not use the word "negligent," but no exception was taken upon this ground, and the jury must have understood, from the whole course of the trial, and the charge, that the defendant was liable only for negligent acts of omission or commission.

We find no error in the record which calls for a new trial. The judgment and order should be affirmed, with costs. All concur.